UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Naoma Full (a.k.a. Naoma Crisp-Lindgren), | ) | Civil Action No. 4:02-4259-RBH-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | |
| | ) | REPORT AND |
| South Carolina Department of Mental | ) | RECOMMENDATION |
| Health, Dr. Charles Bevis, Individually and | ) | |
| in his Official Capacity, and Dr. Phillip | ) | |
| Bowman, Individually and in his Official | ) | |
| Capacity, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter is before the court on the South Carolina Department of Mental Health's (Mental Health) motion for summary judgment (Document # 74) filed November 24, 2004, and the motion for summary judgment (Document # 77) filed by Dr. Charles Bevis (Bevis) and Dr. Phillip Bowman (Bowman) on November 30, 2004.

Plaintiff submits several exhibits to her memorandum in opposition to the motions filed by the defendants. Included within the exhibits are a "Narrative of Chronic Fatigue Secondary to Contagious Epstein-Barr Virus at the Sequaelae" (Exhibit 3), "Naoma Notes" (Exhibit 7), and a letter from an intake investigator with the South Carolina Human Affairs Commission with an attached Charge of Discrimination (Exhibit 14). Defendants have objected to the consideration of these, as well as other, exhibits for purposes of the present motions. Exhibit 3 appears to be a narrative authored by the plaintiff. However, it is not submitted in proper form pursuant to Rule 56(e). Exhibit 7 appears to be notes prepared by the plaintiff recording various events which

-1-

occurred during her employment with the defendant.  The notes are not signed, are not presented by affidavit or other means sufficient under Rule 56(e).  Defendants also object to the consideration of these notes because they were not produced during the course of discovery.  Exhibit 14 appears to be a letter from an Intake Investigator with the South Carolina Human Affairs Commission indicating that a Charge of Discrimination was mailed to the plaintiff on March 22, 2002, and requesting that the Charge be signed, notarized by plaintiff and returned to the Human Affairs Commission within ten days.  There is no indication that the Charge was signed and notarized or returned.  The undersigned is not aware of any evidence that the defendants were aware of this Charge at any point in time prior to its inclusion in the exhibits to plaintiff's opposition memorandum.  Defendants also object to the consideration of this document because it was not produced during discovery.  Plaintiff has not responded to the objections asserted by the defendants.

Likewise, Defendants object to plaintiff's Exhibit 1 (Curriculum vitae), Exhibit 2 (employee evaluation), Exhibit 4 and 6 (leave requests), Exhibit 5 (memorandum from Dr. Bevis to plaintiff), Exhibit 8 (memorandum from plaintiff to Dr. Bevis), Exhibit 11 (memorandum from Dr. Bowman to plaintiff), and Exhibit 12 (two letters of reference).  They object to the consideration of these exhibits as not submitted in compliance with Rule 56.  Exhibits 4 and 6 are included in the information properly submitted by the defendants.  Therefore, their objection to consideration of Exhibits 4 and 6 is without merit.  Defendants do not challenge the authenticity of the memorandum designated as Exhibit 5, but do contest the two documents plaintiff has included with the memorandum.  Therefore, the memorandum designated as Exhibit 5 will be considered for purposes of this motion, but the remaining two documents accompanying the memorandum will not be considered.  Additionally, defendants do not challenge the authenticity of exhibits 8 and 11 and,

therefore, they will be considered as well.

Rule 56(e) provides, "when a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." See also Celetex Corp. v. Catrett, 477 U.S. 317, 324 (1986)(Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves").   To raise a genuine issue of material fact, the petitioner may not rest upon the mere allegations or denials of his pleadings.  Rather, she must present evidence supporting her position through "depositions, answers to interrogatories, and admissions on file, together with ... affidavits, if any." Celetex Corp. v. Catrett, 477 U.S. 317, 322 (1986).   See also Cray Communications, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

The exhibits identified above, except as stated above, submitted by the plaintiff do not comply with the dictates of Rule 56 and, therefore, are not considered in the analysis of defendants' motions for summary judgment.

### Facts

The South Carolina Department of Mental Health (Mental Health) has an office in the Pee Dee area of South Carolina referred to as the Pee Dee Mental Health Center (Pee Dee Center).  The Pee Dee Center has facilities in Florence, Marion, Darlington and Lake City.  Defendant Dr. Charles Bevis (Bevis) was the Executive Director of the Pee Dee Center.  (Bevis Dep. at 5).  Dr. Phillip Bowman (Bowman) was Chief of Psychiatric Services at the Pee Dee Center.  (Bowman Dep. at 7).

Plaintiff, a psychiatrist, began working for Mental Health at its Pee Dee Center on June 17, 1999. She was hired primarily to treat children and adolescents. (Bowman Dep. at 36). Initially, she primarily worked at the Florence facility.[1] (Bowman 2003 Dep. at 36, 41-42). However, when she was hired, she was told that she was subject to being assigned anywhere she was needed, depending on the patient load and demands of clinics. (Bowman Dep. at 55).

There were three staff psychiatrists at the Pee Dee Center, including plaintiff, Dr. Mazgaj, and Dr. Shah. (Bowman Dep. at 17). Dr. Mazgaj was male. (Hightower Dep. at 28). All three staff psychiatrist answered to Dr. Bowman. (Bowman Dep. at 17). Dr. Bowman and Dr. Bevis had disciplinary authority over the physicians. (Bowman Dep. at 19). Dr. Demos, a female neurologist, was hired in June 2001. (Bowman Dep. at 18-19; Hightower Dep. at 28; Bevis Dep. at 12). Dr. Demos was not specifically trained in psychiatry but had licenses and prescribing privileges and did treat child and adolescent patients at the clinics in Florence, Marion, and others. (Bowman Dep. at 18; Bowman 2003 Dep. at 71).

Dr. Bowman was plaintiff's supervisor. (Bevis Dep. at 11). Plaintiff received two performance evaluations while employed at Pee Dee Center, one in 2000 and one in 2001. She Received "exceeds" expectations on her 2000 evaluation. (Bowman Dep. at 87). The 2001 evaluation indicates that she was performing her duties at least at an acceptable level or "meets" expectations. (Plaintiff's Mem. Exh. 2; Bowman Dep. at 87). Under the "Actual Performance" section, the following was written on the form:

Dr. Crisp-Lindgren has unfortunately been ill over much of the rating period.

---

[1] The Florence facility, The Linda Summers Family Center, primarily provides child and adolescent services. (Bowman Dep. at 12). However, the facilities in Darlington, Marion, and Lake City also provided services to children and adolescents. (Bowman Dep. at 14).

-4-

When present, however, her productivity has been excellent and her clinical
skills as a psychiatrist are unquestioned.  I have counseled her over the past
year regarding non-clinical [ ], such as cancelling client appointments when
this could have been avoided, and not notifying me in a timely manner re: her
medical absences.  The "meets" levels above are to some measure determined
simply because her illness has not allowed her to attend reliably to her clinic
obligations over the past year.

The performance evaluation form also contains a "Summary" section which includes the
following written statement:

Dr. Crisp-Lindgren has received counseling over the rating period (see
above).  Absenteeism secondary to illness has been high.  When she has been
able to perform her duties, productivity and quality have been high.

Plaintiff argues that she suffered from a variety of medical conditions while employed at the
Pee Dee Center.  Dr. Bowman was not aware that plaintiff had a disability when she was hired.
(Bowman Dep. at 37).  He observed or was told by plaintiff that she was experiencing some of the
symptoms of an anxiety disorder.  (Bowman Dep. at 38).  After plaintiff informed him of her anxiety
disorder, he began receiving notes for her absences from work from psychiatrist and psychologists
and chiropractors.  (Bowman Dep. at 39).  He received many brief communications from plaintiff's
treating physicians without much information except general discussion of her condition contained
in them. (Bowman Dep. at 44).  Dr. Bowman did not receive any doctors notes indicating she had
specific conditions, but several regarding chronic fatigue and anxiety.  (Bowman Dep. at 53-54).
Medication was not mentioned in the doctors' notes he received.  (Bowman Dep. at 58). He never
understood precisely her clinical condition.  (Bowman Dep. at 44).  Plaintiff first told Dr. Bowman
about an anxiety disorder around June 2000.  (Bowman Dep. at ).   During the following year, she
told him about other illnesses, including gastritis, mold allergy, chronic fatigue syndrome, Epstein-

-5-

Barr virus, migraine headaches, sprained leg, low back pain, sciatica, anxiety and depression. (Bowman Dep. at   ).  Dr. Bevis also testified that he was aware that plaintiff had health problems, but not the specific nature of the problems.  (Bevis Dep. at 10).  He did know it involved a problem with fatigue.  (Bevis Dep. at 21)  Plaintiff's condition seemed to worsen over time.  (Bevis Dep. at 21-22)

During the course of her employment at Pee Dee Center, plaintiff missed a substantial amount of work.  Defendants submit applications for leave[2] submitted by the plaintiff between December 1999 and November 2001.  The leave forms show that plaintiff was absent from work on annual leave or sick leave[3] in excess of 1,500 hours between December 14, 1999, and November 21, 2001.  More specifically, they show hourly leave by month and year as follows:

Dec. 1999 – 9 hrs.                    Dec. 2000 – 0 hrs.
Jan. 2000 – 11.5 hrs.                 Jan. 2001 – 64.5 hrs.
Feb. 2000 – 6 hrs.                    Feb. 2001 – 71 hrs.
March 2000 – 12.5 hrs.                March 2001 – 162.5 hrs.
April 2000 – 18.5 hrs.                April 2001 – 102 hrs.
May 2000 – 30 hrs.                    May 2001 – 121 hrs.
June 2000 – 18.5 hrs.                 June 2001 – 136.5 hrs.
July 2000 – 23 hrs.                   July 2001 – 101.5 hrs.
Aug. 2000 – 93.5 hrs.                 Aug. 2001 – 187 hrs.
Sept. 2000 – 28 hrs.                  Sept. 2001 – 98.75 hrs.
Oct. 2000 – 28.5 hrs.                 Oct. 2001 – 141 hrs.
Nov. 2000 – 27 hrs.                   Nov. 2001 – 71.5 hrs.

Defendants submit the affidavits of several employees of Pee Dee Center describing in detail from the records kept in the ordinary course of business the frequency and extent of plaintiff's absences and the extent of rescheduling necessitated by the absences.  See Affidavit of Kengi

_____

[2] These leave requests were payroll documents that accounted for her time on and off the job.  (Bowman 2004 Dep. at 33 attached to Plain. Mem.).

[3] Some of the sick leave was recognized as leave without pay.

-6-

Stevenson; Affidavit of Norman Creighton; Affidavit of Katherine Cassidy; and Affidavit of Mary

Woodberry.  The affidavits show a substantial amount of absenteeism and associated rescheduling

of patients.

Plaintiff's absenteeism caused disruption with scheduling and caused discontent with some

patients or their families and the staff.  (Hightower Dep. at 24,35-36).  Dr. Bevis testified as follows:

> Her absence from work created significant problems for staff and cancelling
> and rescheduling clients.  I have some vague recollection of complaints about
> the extra work that's imposed on staff, and I know that Dr. Bowman and I
> discussed this.  I think we were trying to communicate to her the difficulties
> that it was causing, and we recommended that she take time off from work
> until she became healthy and then could come back full time for something
> approximating full time on a regular basis that the staff and the clients could
> rely on her being present.  That, as I recall, did not happen.  She would come
> to work on partial days, skip days, and it created unbelievable problems for
> the staff in trying to work with the clients.

(Bevis Dep. at 21-22).

According to the defendants, they attempted to accommodate plaintiff on several occasions

and in several ways.  Dr. Bowman testified as follows:

> We reassigned her to clinics closer to her home[4].  I offered her prior to her
> requesting it a reduced work week.  I instructed the program managers to
> reduce her work load in the sense that we are expected, the psychiatrists are
> expected to see patients generally every fifteen minutes, and I requested that
> they would make that half an hour to an hour which I believe they all
> complied with, and the , I and Pee Dee Mental Health Center afforded her
> leave time to go to Germany for what she thought would be definitive
> treatment that was far in excess of what's federally mandated.  Those were
> some of the accommodations we made for her.

(Bowman Dep. at 48).

Dr. Bevis testified regarding accommodating plaintiff as follows:

---

[4]  Dr. Bowman testified that, at plaintiff's request, he reassigned plaintiff to go to the
Marion clinic more frequently because it was closer to her home.  (Bowman Dep. at 41-42).

Yes, I recall that she wanted some accommodation. I'm trying to think what those requests may have included. Basically, it seems like she was given accommodation, extensive accommodation. She went to Europe, I think, for physician treatment over there, and I think was gone for a month or thereabouts for her problems, health problems. She came back and her work attendance was sporadic, and as I've indicated earlier became very disruptive because so much revolves around the physician being able to see clients, and she would call in in the morning at 9 and say she might not be there 'til 11, call in at 11 and say, "I don't think I can get there 'til 1." Then she might call in at 1 and say, "I'll be there a little bit later this afternoon,"   And then she might not come in for the entire day, and it seemed like she was wanting limitations, and the result was clients who could have been cancelled first thing in the morning ended up coming into the office, then having to be rescheduled with a very high probability that the same thing would happen to them again the next time they would be scheduled with her.

(Bevis Dep. at 22-23).

At one point she requested a return to work for 30 hours a week, which was granted. (Bowman Dep. at 62).  However, she subsequently withdrew this request because of a claim filed for worker's compensation.  (*See* memorandum dated August 13, 2001 from Dr. Bowman to plaintiff).

In August 2001, consistent with restrictions placed on her by her chiropractor and at her request, Dr. Bowman assigned her to work no more than 15 hours per week, including two days at the Marion clinic[5] and two days at the Florence clinic.  (August 27, 2001, memorandum from Dr. Bowman to plaintiff).  The memo states that this limitation would be allowed for six months after which she would be expected to return to full duty.

Dr. Bowman denied a request by plaintiff to increase to a 20-hour work week from a 15-hour work week.  He testified as follows:

_____

[5] At some point while she was working at the Marion clinic and spending the night at a motel, Mr. Creighton offered to drive her to and from the motel to the Marion clinic.  (Creighton Dep. at 53).

> I reviewed, whenever she requested additional work time, I would review how she had been able to fulfill her current obligations. At the time, this was written, she was on 15 hours per week, and she had only been able to work six out of eleven scheduled days. There was no evidence I had that Dr. Carter was aware of this difficulty when he made the recommendation, and I was unwilling to increase her hours until either he could explain his clinical recommendation.

(Bowman Dep at 76-77);(9/18/01 Memo from Dr. Bowman to plaintiff).

Dr. Bowman sent a memorandum to plaintiff on October 31, 2001, which reads as follows:

> Excuses for absences for you have come from multiple doctors, at multiple times. There is not evidence I have at present that any single one of them is fully informed about the extent of your absenteeism. I will repeat my previous request of you, which you still have not acted on: if any one of them will acknowledge the extent of your absences, and give a credible rationale for your increasing your hours, I will be happy to consider that. Please do not repeat your petition for additional hours until this request has been honored. Finally, you have never informed me, or anyone else, to my knowledge, of any "caustic" atmosphere at LMSFS. Up until this time, your consistent request has been to return to full time to that site as soon as possible. Once again, if any of your caretakers can provide a credible rationale that an assignment to this clinic, or indeed any other clinic here at PDMHC, might impede your physical and/or psychological recovery, I will be more than happy to consider an assignment elsewhere.

Then in December 2001, he agreed "if you are able to meet your schedule through the end of the week, will increase hours to 20 hours per week." (December 6, 2001, memorandum from Dr. Bowman to plaintiff).

Plaintiff argues that she was replaced by Dr. Demos. As to this, Dr. Bowman testified as follows:

> With [plaintiff] being unable to report for work on such a regular basis, a lot of our patients were going unseen or delayed, complicated, and made less than optimal because we didn't have the physician manpower. If we had replaced [plaintiff], we would have hired somebody directly into her slot. We did everything we could, including the extended leave time to ensure that she did have a place to work with us, but we needed a physician to see patients.

-9-

> There were in one clinic alone, Kathy Henderson reported 425 patients going
> not seen over the course of time, and that was just one location where she was
> assigned, so we needed physician manpower and on that basis I decided I
> needed to hire someone to take care of the patient load while [plaintiff] was
> recovering.  That was the actual process that we went through.
> . . .
> . . . yeah, no in the sense that the long term plan was to replace [plaintiff] as
> an individual or to hire somebody else into her position, but to at least cover
> for a period when she was unable to perform her duties, and also that, I mean
> I didn't intend to just use Dr. Demos for a period of time.  Had Naoma
> recovered and been able to come back to work, we would have had plenty of
> work for both of those individuals.

(Bowman Dep. at 61, 82).

Evidence is submitted that plaintiff was counseled or reprimanded on a number of occasions.

Dr. Bowman testified as follows:

> I did several written warnings to [plaintiff].  I believe a couple involved her
> not notifying me in a timely manner that she was not going to be at work.
> One involved cancelling patients' appointments without what appeared to me
> and other to be just cause, and her eventual suspension came about because
> there was a second written warning that I did again for her not notifying me
> in a timely manner that she was not going to be at work.

(Bowman Dep. at 25).

He further testified as follows:

> . . . On several occasions clinicians contacted me or patients contacted me
> with the complaint that in their perception [plaintiff] had cancelled patients
> for her own convenience and without due cause.  Based on those complaints
> and interviewing clinicians, who reported that to me, who confirmed that
> story, I issued those warnings, and in addition to the warnings I verbally
> counseled her on several occasions on that.

(Bowman Dep. at 27).  Clinicians that contacted him included Beth Drelich, April Robinson, and

Dana Cockfield.  (Bowman Dep. at 29).  There was no specific departmental policy regarding

cancelling patients.  (Bowman Dep. at 26).  However, the department had a policy about timely

-10-

notifying your supervisor if you are not going to come to work.  (Bowman Dep. at 26).

Dr. Bowman sent to plaintiff a memorandum dated June 25, 2001, addressing attendance problems, the day-to-day notice and cancellations and resulting problems with delivery of service, scheduling with other physicians.  It reads, "[y]ou have been granted 14 weeks leave over last 6 months.  If can't maintain schedule, fulfill essential functions, may have to terminate."

Dr. Bowman also sent plaintiff a memorandum on October 18, 2001, addressing problems with her rescheduling patients, "some several times within the course of a single day."

Defendants present evidence that no other psychiatrist regularly rescheduled patients. (Hightower Dep. at 36).

Dr. Bowman also counseled and reprimanded plaintiff about not timely submitting leave slips. Defendants present memorandums dated August 10, 2001, December 13, 2001, and December 17, 2001, addressing her failure to timely submit time slips.

Additionally, Defendants reference the "Admitted Documents" attached to their motion for summary judgment filed October 27, 2003.  There are multiple internal memorandums included within those documents discussing accommodations made for plaintiff, counseling and reprimands and addressing her absenteeism.

Plaintiff submitted a memorandum to Dr. Bevis dated July 9, 2001, which provides as follows:

> This afternoon, ca. 13:45, Dr. Phil Bowman gave me the following ultimatum: I must either go to the Lake City office on Thursdays or take a leave of absence without pay for those days.  I take issue with his ultimatum and respectfully request the procedure to file a grievance with the Pee Dee Mental Health grievance committee.
> I have been told by my doctors to reduce my stress if I am to continue recovering from my extended illness.  Dr. Bowman has been informed of this

in writing. The long drive and atmosphere at the Lake City office is not low stress and does, in fact, detracts from my ability to give my patients the best care that I can. In the past, I have tried different ways of reducing the stress relative to the long drive by going to the Lake City office the night before and staying in a motel. Given that I have missed nearly four months of work, I no longer am in a position to pay for the nightly hotels nor pay for a chauffeur out of my own pocket.

In the past Dr. Bowman has demonstrated understanding and given me support during my extended illness. I respectfully request of you the grievance procedure and any direction that you may have on resolving this impasse in a friendly and cordial fashion. The primary goal for me is to get healthy, which involves reducing stress, so that our patients, especially the children and adolescents for which I was hired, receive the best care possible. Finally, I have not received in writing an answer from you concerning my request for a loan of one week of sick leave submitted on 30 March 2001. If you can look into this, I would appreciate it.

(Plain. Mem. Exh. 8)

At deposition Dr. Bowman testified as follows:

Q: And why were you intending to terminate her if she did not go to Lake City?
A: Again, Lake City was one of the issues. It was not the only issue. The major concern I had was the disruption of services that was occurring because of her inability to come to work.
. . .
Q: And why did you require her to perform duties or assignments at Lake City as opposed to accommodating her and allowing her to perform them in Marion?
A: The need at the time was to have someone in the Lake City office. That was the organizational need. That was the clinical need in terms of getting patients seen. As I testified earlier, I had to, not had to, but for various reasons either requests or in my judgment it was appropriate, I had to take two people out of the Lake City office. I needed someone down there, and she could not initially give me any satisfactory clinical reason why she should not be assigned there.

(Bowman 2003 Dep. at 63,73 attached to Plain. Mem.). Dr. Bowman further testified as follows:

Q: Do you remember if she told you what types of situations would aggravate her anxiety disorder?
A: She implied, I don't know that she said, she told me that she found the

> drive to Lake City anxiety provoking. At various times she told me that having too many patients assigned made her anxious. Too few patients being assigned made her anxious. The Lake City clinic itself made her anxious. Summer Family Clinic made her anxious. Meeting with me made her anxious. Seeing any patients at all made her anxious. I'm sure there were other things, I don't recall right now.
>
> Q: . . . What would you do?
>
> A: Well, I would try insofar as I could, particularly earlier in the process, I would do whatever seemed reasonable to accommodate her, and that included reducing her hours at the clinics, reducing the amount of patients she had to see. Until again she reported that made her anxious, so we increased the number of patients she had to see, although it never reached the level of what I would expect normal productivity from patients from staff members. We changed the site of where she had to work so she could avoid drives. I mean, when she requested half days, we put her on half days. She requested mornings, we put her on mornings. Then she requested afternoons because she couldn't make mornings, we put her on afternoons. We assigned other physicians to cover her clinics. We eventually hired another physician because there were patients going without adequate treatment. We granted her sick leave up to and well beyond the FMLA requirements. We accepted leave of absences so she could go to Germany for homeopathic treatment. We rescheduled hundreds of patients if not thousands of patients. These are some of the accommodations, probably not all, that we did for her.

(Bowman Dep. at    ).

Dr. Bowman gave plaintiff a Letter of Intent to Terminate, dated July 10, 2001, that was in part based on her unwillingness to work a schedule in Lake City. (Bowman 2003 Dep. at 63,72).(Plain. Mem. Exh. 5).

A memorandum dated April 30, 2001, from Dr. Bevis to plaintiff states as follows:

> I am sorry to learn you are still experiencing fatigue and hope this memo finds you feeling better. It is with much regret that your Sick Leave Pool Request can not be approved at this time due to the severe budget restraints placed on the Center. I hope you can understand this predicament the Center is currently experiencing.
>
> I have been informed by Linda Shillinglaw, Human Resources Services, that other benefits have been applied for on your behalf. Perhaps the other requests will work out advantageously for you.

(Plain. Mem. Exh. 5).

Defendant provided an employee, Ron Hatch, who had terminal cancer and needed a bone transplant, a six month leave without pay. When he did not return after the unpaid leave period, his employment was terminated. (Shillinglaw Dep. at 46-48 and Bevis Dep. at 30-31 attached to Plain. Mem.).

Dr. Bevis had the authority and discretion to grant up to a few days of leave without pay once an employee had used all of their available sick leave and annual leave. Any more than that would require consultation with the State Office in Columbia. (Bevis Dep. at 26-28,31). Dr. Bowman testified as follows:

> Q: Have there ever been other employees that you extended their leave while outside of the FMLA requirements?
> A: None that I know . . .
> Q: Have you had other employees who exhausted their sick leave and had to go into the FMLA leave?
> A: I probably have over ten years. I can't tell you for certain that anyone has used FML. . . . But I don't recall at this point. I may not have. I'm not certain.
> Q: Have you ever had employees that you switched them from full-time to half time to accommodate them due to an illness?
> A: I don't recall ever switching anybody from full-time to half time.
> Q: . . . how do you determine what is appropriate for a particular illness? Appropriate time for a particular illness or appropriate leave for a particular illness?
> . . .
> A: Again, there some leeway that all supervisors are given. If we're talking about a day or two for common illness, I wouldn't question that. I wouldn't require documentation. If it were three, four five days, then I would at least start thinking and may require documentation. After that point, it would pretty much be at the request of the person's attending caretaker. Pretty much. I mean, again, I would grant myself some leeway there to determine how often I needed that recommendation and how comfortable I was complying with it. It's really a case by case situation.

-14-

During the course of her employment, plaintiff received several written reprimands, including as follows:

**November 21, 2000**:
Reasons for Written Warning
I have verbally counseled with you in the past regarding canceling or rescheduling client appointments without good cause, I have established policy for all medical staff regarding this matter (see encl.) I am informed that on 10/17/00 you cancelled a client in order to go to your own medical appointment. After discussion with several staff members who were present, I find that this cancellation was unnecessary and violated the established policy of seeing all patients who present for their scheduled medical appointment. You delayed seeing the first client of the day for approximately 25 minutes because you had forgotten to bring a prescription pad to the location. This delay was arbitrary and unreasonable. The clinical interview could have begun at the scheduled time without you being in possession of the script pad. It is my opinion, based on conversations with staff members who were present when the schedule was discussed and reviewed with you, that you were fully aware of each client on the schedule that morning and could have apportioned the time spent with each in order to accommodate all of them. Instead you spent over an hour with the first patient, who was scheduled only for a half hour appointment. This combined with your unjustified refusal to see the first client at the scheduled appointment time, led to the cancellation of the last patient. Finally, you did not notify me of the cancellation or request prior approval of it, per the enclosed policy.
Consequences of Future violations or Misconduct:
Progressive disciplinary action, up to and including suspension without pay from your job.
Employee Comments:
I postponed my first pt. as I had no PMA notes, not script pad. When I discussed my intention w/ Donna Schaeffer, MTS, pt's GM & MHP all were understanding. MTS & GM said they would be back in several weeks & I could meet with them then. No one indicated anger. I could have returned after MD appt but no one suggested that.

**November 21, 2000**
Reasons:
I have previously outlined steps for medical staff to notify me in case of unscheduled sick leave (see encl.), and I have verbally consulted with you regarding this in the past. On 10/30/00 you called me well past the established time and explained you had taken medication earlier in the morning which put you to sleep and prevented you from notifying me in a

timely manner.  On 11/08/00 you beeped me approximately 4PM and told me you had beeped me earlier and within the time limits allowed but that I had not responded.  Please be aware that on both these occasions you did not follow the established procedure (again, see encl.); that is, on 10/30/00 you did not make any attempt to notify me within the time limit, and on 11/08/00 you did not attempt to contact Dr. Bevis when you were unable to contact me by beeper.  These are just two recent instances of many when you have been out sick and I as your direct supervisor have not been aware of it until well after the specific time limits.

In the future you will strictly adhere to the procedure described in the enclosures.  You will speak with me personally prior to 9 am of any day when you are unable to come to your scheduled work site for any reason.  If for any reason, I am unavailable at my home or office phone or by beeper, you will call the Executive Office at (843)661-4875 and directly inform Dr. Bevis.  If you are unable to contact Dr. Bevis, you will inform the secretary on duty at the Executive Office of your absence and request that she forward this information to me or Dr. Bevis at the earliest possible moment.  She will record the date and time of the telephone call from you and, assuming it is before 9 am of the day in question, you will be in compliance with established procedures.

Consequences of Future Violations or Misconduct:

Progressive disciplinary action, up to and including suspension without pay from your job.


**November 13, 2001, Memorandum from Dr. Bowman to plaintiff Re: Intent to Suspend**

You did not follow the established procedure for notifying me of your absence due to illness for the dates 10/29/01 through 11/01/01.  This procedure has been explained repeatedly to you both verbally, as well as in a previous Written Warning (11/21/00), memo (5/9/00) and medical staff meeting (8/3/00).  In my memo of 10/31/01 I invited you to inform me if there had been any attempt on your part to follow the proper procedure, and you have not responded to that request in the absence of a timely response, I conclude there was no attempt to comply.  By our acts and omissions, you have violated SCDMH Directive No. 781-94, "Leave Policies," Center policy with respect to notification of absence due to illness and my specific instructions.

As a result, it is my intention to suspend you from duty, for five (5) working days, beginning November 26, 2001 through the close of business on November 30, 2001, for Violation of Written Rules, Regulations or Policies.  Before this decision is made final, you have the opportunity, at your request, to meet with Ms. Lou Michael, Interim Director, or her designee, for a pre-suspension conference.  Your request must be in writing and made within two

-16-

(2) days of your receipt of this memorandum, if it is hand-delivered, or within five (5) calendar days from the date of mailing, if mailed.

**November 16, 2001 Memorandum from Dr. Bowman to plaintiff**
I have received yours of 11/16/01. So there should be no future questions regarding this, let me put in writing the schedule I believe we have agreed to. I understand your current work schedule to be 1PM to 5PM Monday through Wednesday and 1PM to 4PM on Thursday. You are currently assigned to Linda M. Summers Family Services Monday and Thursday, and to the Marion Clinic Tuesday and Wednesday. If this differs in any way from your understanding of your schedule, please let me know immediately.
(Plain. Mem. Exh 13)

**Notice of Suspension dated November 19, 2001**
Reason for Suspension:
You did not follow established procedure for notifying me of your absence due to illness for the dates 10/29/01 through 11/1/01. This procedure has been explained repeatedly to you both verbally, as well as in a previous Written Warning (11/21/00), memo (5/9/00) and medical staff meeting (8/3/00). In my memo of 10/31/01 I invited you to inform me if there had been any attempt on your part to follow the proper procedure, and you have not responded to that request in the absence of a timely response, I conclude there was no attempt to comply. By our acts and omissions, you have violated SCDMH Directive No. 781-94, "Leave Policies," Center policy with respect to notification of absence due to illness and my specific instructions. In the future you will adhere to the policy, which is thoroughly described in documents you should have in you possession.
A suspension is an action for which you may file a grievance appeal. If you wish to file a grievance appeal, you must do so within fourteen (14) calendar days from the first day of your suspension, or from the date of this Notice of Suspension, whichever is later. The grievance review request must be received by the Employee Relations Section, Human Resources Services, SCDMH, 2414 Bull Street, Columbia, SC within the stated deadline.
Inclusive Dates of Suspension:
November 26, 2001 through November 30, 2001 (Five Days)
Consequences of Future Violations or Misconduct:
Progressive Discipline in accordance with SCDMH Directive No. 819-99, "Employee Disciplinary Standards," up to and including dismissal.
Employee Comments:
I followed Dr. Bowman & Directives from SCDMH regarding notification of leave for above mentioned dates. I find this [ ] of written warning/suspension out of compliance with policy & procedure for SCDMH. I therefore do no accept this suspension & will grieve this with HA in

-17-

Columbia.[6]

**November 19, 2001 Record of Employee Counseling** (signed by Dr. Bowman)
Reason for Employee Counseling:

Over the past weeks, I have received several reports from several staff members, indicating that you have been openly critical of me on a personal and professional basis. Specifically, I have been told that you hold me personally responsible for certain physical (e.g., back pain) as well as your emotional problems. Openly criticizing your direct supervisor is unprofessional, insubordinate, & hurts morale in the workplace. I have also received several reports of you openly disputing my limitation of your work hours.
Sequences of Future Violations or Misconduct:
If I am reliably informed of any further such behavior on your part, you will receive a written warning & any disciplinary action such a warning might warrant.

**November 19, 2001**
Reason for Written Warning:
I am informed by support staff and the Program Director at Marion that you directed one of the staff there to schedule a client outside your normal working hours (i.e., at 12:30 PM on 11/21). This is in direct violation of my direction to you not to change, or even discuss a change, in your schedule without discussing it first with me, your direct supervisor (see memo date 10/31). Your failure to follow a clear direction from is insubordinate. You will no longer attempt to subvert this decision by scheduling yourself for hours outside those I have approved. This includes seeing patients later than your scheduled hours, as you have recently done. If it appears that your assigned workload will be too much for you to accomplish within your scheduled hours, you will notify me and I will at that time discuss the issue with you and the local clinic director, and provide direction based on the circumstances.
Consequences of Future Violations or Misconduct:
Progressive disciplinary action, up to and including suspension from work or dismissal. If you choose to work outside your scheduled hours without informing me of this prior to the event and receiving approval, I will not authorize payment for those hours.

---

[6] As shown in the "Admitted Documents", plaintiff did grieve the suspension and the suspension was upheld.

Dr. Bowman also testified as follows:

> Q: Did you document the informal . . . the verbal disciplinary actions? Did you document those in any way?
> A: I believe . . . you know, I haven't reviewed that. I certainly in the context of memos, which I believe are in your possession, the nature of my instructions to her an my supervision to her, which I recall verbal counseling, such things as don't cancel patients without due notice; don't call clinics in the morning and tell them to reschedule everybody for the afternoon and then not come in that afternoon. A lot of that verbal counseling is contained . . . Were documented or as described in those memos.
> . . .
> A: Verbal counseling . . . this is my understanding, I'm pretty sure it's accurate. The levels of disciplinary action are informal, verbal. Otherwise called verbal. Written, which is formal. And then anything beyond that includes suspension, termination, is at a different level. What's called . . . the difference between verbal and written is not so much whether you speak to somebody or memorialize it in writing. It's whether it is part of their disciplinary action that's held in their local folder. I would have on some occasions discussed this with Naoma before sending a memo. In some cases I could not have. The point is there were a lot of issues I chose not to make part of her formal disciplinary personnel record. Beyond that there were, as I best recall, four times I felt it was serious enough or repeated often enough to make it a formal written counseling. And then finally, after those means had been exhausted, there was a suspension.

(Bowman Dep. at    ).

Defendants also submit a portion of the deposition of Dr. Charles Bevis. Dr. Bevis testified that it was policy that an employee was to inform their supervisor if they were not going to be present at work, and that each time an employee used leave, whether sick or annual, the employee was required to fill out and submit a leave form, and that the leave would have to be approved by the employee's supervisor. (Bevis Dep. at 22-23). He also testified that employees could accrue 15 days a year sick leave. (Bevis Dep. at 24). Dr. Bevis testified that if an employee used all their sick leave, they could the use annual leave but, again, all leave had to be approved in advance by the supervisor. (Bevis Dep. at 25). If all sick leave and annual leave was exhausted, the employee may

-19-

request leave without pay which can be granted on a limited basis. (Bevis Dep. at 25-26).  He further

testified as follows:

> A: As I recall, to the best of my ability, they would have to request what amount of time they might need, and that would be brought to me probably. And as the center director, I might have to approve that or disapprove it.  If there was – if we were probably talking about just a couple of days or something like that, I don't think I would have seen any problem.  But if it was bigger than that, I would have probably asked Linda Shillinglaw to discuss it with her people in Columbia.
> . . .
> Q: Whose discretion – Who has the discretion to determine whether to grant that leave request or not?
> A: Are you talking about leave without pay?
> Q: Yes.
> A: As I just said, if it was just for a few days, I would – as I recall, I think I might approve or disapprove that, if we're just talking about a few days, in the consultation with the supervisor.  Again, some position are more critical than other and might bear closer scrutiny.  But you would have to look at the disruptive element in the operation of the center that this might cause and balance all of those things together.
>
>     And my guess is that under those circumstances, we would have asked for some guidance on the matter from someone in the state office.
> Q: So you ultimately – going back to my question, you are the ultimate – you are the ultimate authority to determine whether somebody could use unpaid leave or not?  There was nobody above you?
> A: If we're talking about a very limited amount of leave. But if it was more than a very limited amount – and I don't recall the cut off figure for that – the state office would have to be involved.
> . . .
> Q: So can you walk me through – if I'm an employee and I've been – I've used up all of my sick leave, I've used up my annual leave, and now I've come to you requesting three months of unpaid leave, how would that – how would that go?
> A: My guess is I would turn it down and that we would put – inform the state office in Columbia of the request, get their opinion and that they would probably turn it down.  I don't – you create a lot of disruption if you have a person on sick leave, leave without pay for that period of time.  But again, I'm a little rusty on those specific aspects that you're asking me about.  And so I'm a little bit open to a review of that.  But that's the best I can recall at this time.
> Q: So are there any instances when you remember – that you specifically

-20-

remember when an employee was accommodated with more than three months of unpaid leave?

A: I can't ever think of any event like that.

(Bevis Dep. at 27-29).

Defendants also submitted that affidavit of Dr. Bevis wherein he states that his last day of employment with the Pee Dee Mental Health Center was September 27, 2001.

Plaintiff resigned from her employment with Mental Health on January 10, 2002.

Dr. Bowman verbally counseled Dr. Mazgaj on several occasions. One involved an incident where he left a nurse practitioner at a site and drove back in a state car. (Bowman Dep. at 32). One incident involved an allegation that he kicked a stuffed animal and it struck a co-worker. (Bowman Dep. at 33). One incident involved an allegation that he made inappropriate comments at staff meeting, sexual innuendoes. (Bowman Dep. at 34). One incident involved his dissemination of a document called the Southern Dictionary. (Bowman Dep. at 34). Dr. Bowman does not recall ever speaking with plaintiff about the Southern Dictionary. (Bowman Dep. at 82). However, a lot of people were offended by the Southern Dictionary. (Creighton Dep. at 26).

Dr. Bowman also testified that a dispute arose between himself and Audrey Joseph. Mr. Audrey was under Dr. Bowman's direct supervision and Ms. Joseph at some point filed a lawsuit which included Dr. Bowman as a defendant. Because he felt awkward serving as her supervisor while the lawsuit was pending, he temporarily turned over her supervision to either plaintiff or Dr. Shirlyn Campbell. After about three months, it was decided that Dr. Bowman and Ms. Joseph would sit down in the presence of plaintiff and Dr. Shirlyn Campbell to determine if there was some way he could continue to supervise her in a way that they were both comfortable. The Southern Dictionary disseminated by Dr. Mazgaj was one of the issues that needed to be put to rest between

-21-

Dr. Bowman and Ms. Joseph.  This issue came up during the meeting he had with Ms. Joseph in the presence of plaintiff and Dr. Campbell.  (Bowman 2003 Dep. at 83-85 attached to Plain. Mem.).

### Standard for Summary Judgment

Defendants filed their motion for summary judgment pursuant to Rule 56, FRCP.  The moving party bears the burden of showing that summary judgment is proper.  Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Rule 56(c), FRCP; Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof.  Celotex, 477 U.S. 317. Once the moving party has brought into question whether there is a genuine issue for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine issue for trial.  Fed.R.Civ.P. 56(e); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986).  The non-moving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party.  Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991).  However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment.  Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992).  The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits."  Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

Defendants Bevis and Bowman argue that they are entitled to summary judgment on all

-22-

claims.  Initially, they argue that plaintiff's complaint does not state a claim under Title VII, the
ADA or the ADEA against them in their individual or official capacities.

### Individual Liability under Title VII, the ADA and the ADEA

Defendants assert that plaintiff's claims under Title VII, the ADA, and the ADEA should be
dismissed because those statutes do not provide for individual liability.  Plaintiff cites the cases of
Paroline v. Unisys Corp., 879 F.2d 100 (4th Cir. 1989), *rev'd in part en banc*, 900 F.2d 27 (4th Cir.
1990), and Emmons v. Rose's Stores, Inc., 5 F.Supp.2d 358 (E.D.N.C. 1997), to support her
argument for individual liability.  Paroline held that individuals could be held personally liable in
a Title VII case if they met the statutory definition of employer which the court construed to include
individuals who "serve in a supervisory position and exercise . . . significant control over plaintiff's
hiring, firing or conditions of employment."  Paroline, 879 F.2d at 104.[7]  The district judge in
Emmons recognized the doubt of the continuing viability of Paroline, and decided the case consistent
with the Fourth Circuit's decision in Birkbeck v. Marvel Lighting Corp., 30 F.3d 507 (4th Cir. 1994).
Birkbeck addressed the availability of individual liability in an action brought pursuant to the Age
Discrimination in Employment Act (ADEA).  After discussing the statutory definition of "employer"
and finding little sense to hold a single defendant liable when Congress expressly exempted all
employers, corporate, individual or otherwise, from liability if it employed fewer than the requisite
number of employees triggering applicability of the ADEA itself, it held a individual supervisor
could not be held liable under the ADEA.  Id. at 510.  However, the Birkbeck court did limit the
holding to employees/agents engaging in "personnel decisions of plainly delegable character."  Id.
at n.1.  Subsequent to Birkbeck, the Fourth Circuit, noting the similarity and relation in statutory

---

[7]  Paroline was reversed *en banc* on other grounds.

language and Congressional intent relating to the ADEA, ADA and Title VII, held that there is no individual liability in cases brought pursuant to the Title VII, Lissau v. Southern Food Service, Inc., 159 F.3d 177, 181 (4th Cir. 1998), or the ADA, Baird v. Baird, 192 F.3d 462, 472 (4th Cir. 1999). The Lissau and Baird decisions do not contain the caveat or limitation based upon "delegable decisions"[8] and emphasize the definition of "employer" under the respective statutes. Title VII, the ADA, and the ADEA contain definitions of "employer" to include a person who employs a certain number of employees. 42 U.S.C. §2000e(b)(Title VII); 42 U.S.C. §12111(5)(A)(ADA); 29 U.S.C. §630(b)(ADEA). Plaintiff emphasizes that the relevant statutory definitions include "agents" of such persons. This contention was directly rejected in the Lissau and Birkbeck decisions. Lissau, 159 F.3d at 180; Birkbeck, 30 F.3d at 510. The Fourth Circuit has also clearly held that the 1991 Amendments did not alter and, in fact, support the determination that there is no Congressional intention to include individual liability under Title VII. See Lissau, 159 F.3d at 180.

Based on the current state of the law in this circuit and under the facts presented, plaintiff's causes of action under Title VII, the ADA and the ADEA against the defendants in their individual capacities should be dismissed.

### Official Capacity under Title VII, the ADA, and the ADEA

Defendants also argue that claims against Bevis and Bowman under Title VII, the ADA and the ADEA in their official capacities should be dismissed. Plaintiff does not contest this in her memorandum. Therefore, it is assumed that plaintiff has abandoned this claim and summary judgment should be granted.

---

[8] Even assuming, arguendo, that individual liability is available for conduct of a non-delegable character, plaintiff has failed to present sufficient evidence of such conduct to defeat defendants' motions under Rule 56 to show such conduct.

Defendants next argue that the court lacks subject matter jurisdiction to hear plaintiff's claims brought pursuant to §1981 and §1983, and that plaintiff has failed to establish a prima facie case under those statutes.

### §1981

Plaintiff's exclusive remedy against a state actor for violation of §1981 is §1983.  Jett v. Dallas Ind. Schools Dist., 491 U.S. 701, 735 (1989).[9]  To the extent plaintiff asserts her claims under §1983 against the SCDMH and Bevis and Bowman in their official capacities, such claims are without merit.  Will v. Michigan Dept. Of State Police, 491 U.S. 58 (1989), holds that state actors are not "persons" under  §1983, and that an action against an individual in his official capacity is a claim against the state itself.  As set forth by the defendants, the Eleventh Amendment provides immunity to states against suits brought against them in federal court.  Pennhurst State School and Hospital v. Halderman, 465 U.S. 89 (1985).

Plaintiff appears to argue that the principles of Monell v. New York City Dept. of Social Services, 436 U.S. 658 (1978), carves out an exception to Eleventh Amendment immunity.  Monell applies to municipalities and local government entities and not to states or state agencies.  Therefore, plaintiff's argument is without merit.

Assuming, plaintiff does state a claim under §1983, or §1981 for that matter, against Bevis and Bowman in their official capacities or their individual capacities  for discrimination based on

---

[9]  The Fifth Circuit in Felton v. Polles, 315 F.3d 470 (5th Cir. 2002), appears to hold that a plaintiff may have a direct §1981 claim against a state actor in his official capacity when the state actor and the state are "essentially the same" for purposes of the complained of conduct.  The undersigned opines that the holding in Jett, infra, is contrary to this position.  Nonetheless, even assuming, arguendo, that an official capacity suit against a state actor is viable under §1981, the law is not clearly established and Bevis and Bowman are, therefore, entitled to qualified immunity for such a claim.

race, gender, age and or disability, the merits of such claims are discussed below.[10]

**Age Discrimination Claim**

The ADEA provides as follows:

It shall be unlawful for an employer –

(1) to fail to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.

29 U.S.C. §623(a)

In order to make out a prima facie case under the ADEA, Plaintiff must demonstrate (1) that she was a member of a protected age group; (2) that she was subject to adverse employment action; (3) that her job performance met the employer's reasonable expectations; and (4) that she was replaced by a younger individual. Mitchell v. Data Gen. Corp., 12 F.3d 1310, 1314 (4th Cir. 1993). The fourth element can be satisfied by showing circumstances giving rise to a reasonable inference of unlawful discrimination. Halperin v. Abacus Tech. Corp., 128 F.3d 191. 201 (4th Cir. 1997).

There is no dispute as to the first element. Plaintiff is over forty years of age. However, defendants challenge plaintiff's *prima facie* case on the remaining elements.

Adverse Employment Action

Conduct short of "ultimate employment decisions – to hire, discharge, refuse to promote, etc. – can constitute an adverse employment action under Title VII." Von Gunten v. Maryland, 243 F.3d 858, 865 (4th Cir. 2001). Retaliatory harassment also can constitute an adverse employment action. Id. (Citing Ross, 759 F.2d at 363). Plaintiff must establish that the challenged discriminatory acts

---

[10] Discrimination claims involving public employment brought under §1983 are analyzed the same as a claim brought under Title VII. Beardsley, 30 F.3d at 529; Holder v. City of Raliegh, 867 F.2d 823,828 (4th Cir. 1986).

or harassment adversely affected "the terms, conditions, or benefits" of her employment. Id. (citing Munday v. Waste Mgmt. Of North America, Inc., 126 F.3d 239,243 (4th Cir. 1997)).

Plaintiff must show that the change was significant. See Von Gunten, 243 F.3d at 868 (a significant change in job assignment can adversely effect a person's terms, conditions and benefits of employment); See generally Burlington Industries, Inc. v. Ellerth, 118 S.Ct. 2257, 2268 (1998)("A tangible employment action constitutes a significant change in employment status, such as...a decision causing a significant change in benefits."); Page v. Bolger, 645 F.2d 227, 233 (4th Cir. 1981); Crady v. Liberty Nat. Bank & Trust Co. of Ind., 993 F.2d 132, 136 (7th Cir. 1993)("A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation."); cf. Kocsis v. Multi-Care Management, Inc., 97 F.3d 876, 887 (6th Cir. 1996)(demotion without change in pay, benefits, duties or prestige insufficient); Harlston v. McDonnell Douglas Corp., 37 F.3d 379, 382 (8th Cir. 1994)(reassignment to a more inconvenient job insufficient); Williams v. Bristol-Myers Squibb, 85 F.3d 270, 274 (7th Cir. 1996)(A transfer that does not involve a demotion in form or substance does not rise to the level of an adverse employment action).

Plaintiff argues that she suffered adverse employment actions, including (1) the denial of her sick leave request, (2) being forced to make the drive to Lake City, (3) being required to submit leave slips, (4) being forced to work an unreasonable schedule, (5) being constructively discharged, and (6) being suspended for five days.

The denial of her sick leave request, being assigned to duties in the Lake City office, and being required to submit leave slips do not constitute adverse employment action. Plaintiff fails to

-27-

submit evidence establishing that she was required to work an unreasonable schedule. These actions generally are insufficient to show an adverse employment action and plaintiff fails to present any evidence in proper form to show they could rise to the level of adverse employment action in this case.

The five-day suspension without pay and a constructive discharge are sufficient to meet the second element of the *prima facie* case.

Job Performance

Plaintiff fails on the third element as well, fails to show she was performing at a level that met her employer's reasonable expectations. The undisputed evidence is that plaintiff missed approximately 119 days of work in 2001. It is also undisputed that plaintiff was counseled and reprimanded on multiple occasions regarding rescheduling of patients, failing to timely submit leave slips and not providing timely notice of absences. Also, it is undisputed that plaintiff's extensive absenteeism and rescheduling caused significant disruption and problems in terms of rescheduling patients, as well as resulting discontent with patients and staff. Thus, plaintiff fails on the third element of the *prima facie* case.

Replaced by Younger Individual

Last, plaintiff fails to establish the fourth *prima facie* element. She fails to present proper evidence of Dr. Demos' age. Additionally, She fails to properly present other evidence that raises an inference of discrimination based on age.

Accordingly, plaintiff fails to establish a *prima facie* claim of age discrimination under §1983 or the ADEA, assuming she could bring a direct ADEA action against these defendants.

**Discrimination Based on Race**

The parties agree that this claim is properly analyzed under the method established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)(pretext).[11]

Under the McDonnell Douglas analysis, plaintiff has the initial burden of demonstrating a *prima facie* case of discrimination.  To establish a *prima facie* case of discrimination based on race, plaintiff must show (1) she is a member of a protected class; (2) she was qualified for her job and her job performance was satisfactory; (3) she suffered an adverse employment action; and (4) other employees who are not members of the protected class were retained under apparently similar circumstances.  Bryant v. Bell Atlantic Maryland, Inc., 288 F.3d 124, 133 (4th Cir. 2002).[12]  The fourth element can be established by presenting evidence raising an inference of discrimination.  See EEOC v. Sears Roebuck & Co., 243 F.3d 846, 851 n.2 (4th Cir. 2001)(citing Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248 (1981)).  Once plaintiff has established a *prima facie* case, the burden shifts to the defendant to produce a legitimate, nondiscriminatory reason for the termination.  Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 ((1981).  This is merely a burden of production, not of persuasion.  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993).   Once the defendant has met its burden of production by producing its legitimate, nondiscriminatory reason, the sole remaining issue is "discrimination *vel non*."  Reeves v. Sanderson

---

[11]  The McDonnell Douglas analysis was refined in St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993), and Reeves v. Sanderson Plumbing Products, Inc., – U.S. –, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

[12]  The required elements of a prima facie case of  employment discrimination are the same under Title VII and Section 1981.  Gairola v. Commonwealth of Va. Dept. of Gen. Servs., 753 F.2d 1281, 1285 (4th Cir.1985).

-29-

Plumbing Products, Inc., 530 U.S. 133, 143 (2000)(citing Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 716 (1983)).  In other words, the burden shifts back to the plaintiff to demonstrate by a preponderance of the evidence that the legitimate reason produced by the defendant is not its true reasons, but were pretext for discrimination.  Reeves, 530 U.S. at 143.  During all of the burden shifting scheme set forth in McDonald Douglas, the ultimate burden of proving that defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.

Plaintiff has the ultimate burden of presenting evidence from which a reasonable jury could conclude defendant intentionally discriminated against her based on her race.

Protected Class

Plaintiff argues that she meets the first element of a *prima facie* case – member of a protected class – because she advocated for minorities and advised African American employees to seek the legal  advice regarding discriminatory policies and procedures in the Department of Mental Health. See Peters v. Jenney, 327 F.3d 307 (4th Cir. 2003)(individual may fall under protected class when they have been purposefully injured due to their opposition to intentional discrimination).  Initially, plaintiff's assertions are conclusory and not supported by properly submitted evidence.  The only evidence presented on this issue is the testimony about Dr. Mazgaj disseminating a Southern Dictionary.  To draw an inference from this evidence sufficient to be meaningful here would require pure speculation.  There is no evidence of the content of the "Southern Dictionary" or why it was offensive to others.  The evidence establishes that it was offensive to others, including Audrey Joseph, and that Dr. Bowman and Ms. Joseph had a dispute which included something about Dr. Mazgaj's dissemination of it.  Additionally, no evidence is properly submitted to indicate that plaintiff complained to the defendants or that Dr. Bowman even had a conversation with plaintiff

about it.  The evidence shows that plaintiff was present along with another physician while Dr. Bowman and Ms. Joseph resolved a supervision issue.

The evidence submitted by the plaintiff is insufficient to meet the first element of a *prima facie* case.

Adverse Employment Action/Job Performance

The discussion under the age discrimination claim regarding the second and third elements are adopted and incorporated herein.  Therefore, she fails to meets these elements of the *prima facie* case under her race discrimination claim, as well.

Others Retained Under Similar Circumstances

Plaintiff asserts that Ron Hatch, a white employee, who had a chronic, terminal illness was allowed to take sick leave without pay for a period of six months.  Plaintiff must establish that "other employees" were similarly situated in all relevant respects; that they "dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Mitchell v. Toledo Hosp., 964 F2d 577, 583 (6th Cir. 1992)(citing Mazzella v. RCA Global Communications, Inc., 642 F.Supp. 1531 (S.D.N.Y.1986), aff'd, 814 F.2d 653 (2d Cir.1987); Lanear v. Safeway Grocery, 843 F.2d 298 (8th Cir.1988) (plaintiff must prove that he and the white employee were similarly situated in all respects and that the other employee's acts were of comparable seriousness to his own); Cox v. Electronic Data Systems Corp., 751 F.Supp. 680 (E.D.Mich.1990)); Radue v. Kimberly-Clark Corp., 219 F3d 612,617-18 (7th Cir. 2000)(holding that plaintiff must demonstrate that the same supervisor was involved in comparable situations to demonstrate disparate treatment of similarly situated employees); Stanback v. Best Diversified

Products, Inc., 180 F.3d 903,910 (8th Cir. 1999)(same); Shumway v. United Parcel Serv., Inc., 188 F.3d 60,64(2d Cir. 1997)(employees were not similarly situated because they were not supervised by the same person).[13]

Mr. Hatch and plaintiff clearly were not similarly situated and plaintiff fails to present other evidence sufficient to raise an inference of discrimination based on race. Therefore, defendants are entitled to summary judgment against plaintiff's claims based on race discrimination whether analyzed under Title VII, §1983, or §1981.

### Gender Discrimination

To prove a *prima facie* case of gender discrimination, plaintiff must prove that (1) she is a member of a protected class, (2) she was qualified for her job and her job performance was satisfactory; (3) she suffered an adverse employment action; and (4) other employees who are not members of the protected class were treated more favorably

Plaintiff asserts that the adverse action was the denial of her sick leave requests. As set forth above, this does not constitute an adverse employment action. Assuming, however, that it does, as set forth above, plaintiff fails to show that her job performance was satisfactory. Additionally, plaintiff argues that Ron Hatch, a male employee, was treated more favorably than she. Again, Mr. Hatch is not a proper comparator. In addition to the discussion above, his leave request was for unpaid leave while plaintiff's request was for paid leave. Therefore, plaintiff fails to set forth a *prima facie* case of discrimination based on gender.

_____

[13] There is no published Fourth Circuit case on point; however, the Fourth Circuit has cited with approval the precedent in this string cite in the unpublished cases of Flateau v. South Carolina Commission for the Blind, 2002 WL 31553805 (4th Cir. 2002); Heyward v. Monroe, 1998 WL 841494 (4th Cir. 1998); Edwards v. Newport News Shipbuilding and Dry Dock Co., 1998 WL 841567 (4th Cir. 1998).

Legitimate, Nondiscriminatory Reasons

However, assuming, arguendo, plaintiff has presented a *prima facie* case of discrimination based on age, gender, race, or disability, defendants set forth their legitimate, nondiscriminatory reasons.

As set forth above in the "Facts" section, plaintiff was absent from work an extraordinary amount of time. She failed to abide by department policy and directives from Dr. Bowman regarding the timely submission of leave slips and timely notice of absences. Additionally, her absences and untimely notice thereof caused significant disruption in patient care and discontent with staff and patients. Plaintiff has failed to present an issue of fact regarding pretext and has failed to present sufficient evidence from which a reasonable jury could conclude defendant intentionally discriminated against her on the basis of race.

It is not necessary to decide "whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination."[14]  Hawkins v. Pepsico, 203 F.3d 274, 279 (4thCir. 2000)(quoting and citing DeJarnette v. Corning, Inc., 133 F.3d 293, 299(4th Cir. 1998); DeJarnette, 133 F.3d at 299 ("[T]his Court does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination ...." (internal quotation marks omitted)); Henson v. Liggett Group, Inc., 61 F.3d 270, 277 (4th Cir.1995) ("We have recognized the importance of giving an employer the latitude and autonomy to make business decisions, including workplace reorganization, as long as

---

[14]  "Proof that the employer's proffered reasons in unpersuasive, or even obviously contrived, . . . does not necessarily establish that [plaintiff's] proffered reason (race discrimination) . . . is correct." Reeves, 530 U.S. at 146-47. "It is not enough to disbelieve the [employer]." Love-Lane v. Martin, 355 F.3d 766, 788 (4th Cir. 2004). Plaintiff must show a reasonable jury could "believe [her] explanation of intentional race discrimination." Id.

the employer does not violate the ADEA."); Jiminez v. Mary Washington College, 57 F.3d 369, 377

(4th Cir.1995) ("Title VII is not a vehicle for substituting the judgment of a court for that of the

employer"). It is the perception of the employer that is critical. Hawkins, 203 F.3d at 280. Even

a reasoned decision based on incorrect facts is not evidence of pretext. Pollard v. Rea Magnet Wire

Co., 824 F.3d 557, 559 (7th Cir. 1987), cert. denied, 484 U.S. 977 (1987).[15]

### Retaliation Claim

42 U.S.C. §2000e-3(a) provides, in relevant part, as follows:

> It shall be an unlawful employment practice for an employer to discriminate
> against any of his employees . . . because he has opposed any practice made
> an unlawful employment practice by this subchapter, or because he has made
> a charge, testified, assisted, or participated in any manner in an investigation,
> proceeding, or hearing under this subchapter.[16]

In order for plaintiff to state a *prima facie* case for retaliation under the opposition clause,

she must show (1) she engaged in a protected activity, (2) defendant took adverse employment action

---

[15] Additionally, plaintiff must challenge each of defendants' reasons. See Machinchick
v. PB Power, Inc., 398 F.3d 345 (5th Cir. 2005)( employee must put forward evidence rebutting
each one of employer's nondiscriminatory explanations for employment decision at issue); Olsen
v. Marshall & Ilsley Corporation, 267 F.3d 597,601 (7th Cir. 2001)(plaintiff must show each of
defendant's reasons is pretextual to withstand summary judgment); see also Chapman v. A.I.
Transport, et al., 229 F.3d 1012, 1037 (11th Cir. 2000)(stating in dicta that plaintiff must produce
sufficient evidence to refute each of the employer's proffered reasons). In Olsen, the Seventh
Circuit did note an exception to this rule that they have recognized. "'There may be cases in
which the multiple grounds offered by the defendant for the adverse action . . . are so intertwined,
or the pretextual character of one of them so fishy and suspicious, that the plaintiff could
withstand summary judgment' by pointing out the pretextual nature of one reason." Id. (citing
and quoting Wolf v. Buss (America), Inc., 77 F.3d 914, 920 (7th Cir. 1996).

[16] The Civil Rights Act of 1991 amended Title VII to provide that a statutory violation
has occurred if race, color, religion, sex or national origin was a motivating factor for an adverse
action. However, the Civil Rights Act of 1991 did not amend §2000e-3(a), the retaliation statute.
See Kubicka v. Ogden Logistics Services, 181 F.3d 544, 552, note 7 (4th Cir. 1999).

against her, and (3) a causal connection existed between the protected activity and the adverse action. Matvia v. Bald Head Island Management, Inc., 259 F.3d 261, 271 (4th Cir. 2001); Ross v. Communications Satellite Corp., 759 F.2d 355, 365 (4th Cir. 1985). In order to establish the requisite causal connection, plaintiff must proffer evidence which establishes that she would not have been terminated but for her protected activity. Hopkins v. Baltimore Gas & Electric Co., 77 F.3d 745, 755 (4th Cir. 1996).

To establish "protected activity" plaintiff must show that she opposed an unlawful employment practice which she reasonably believed had occurred or was occurring. Bigge v. Albertsons, Inc., 894 F.2d 1497, 1503 (11th Cir.1990); see also Ross, 759 F.2d at 355 n. 1 (stating that a Title VII oppositional retaliation claimant need not show that the underlying claim of discrimination was in fact meritorious in order to prevail). "The inquiry is therefore (1) whether [plaintiff] "subjectively (that is, in good faith) believed" that the district had engaged in a [illegal practice], and (2) whether this belief 'was objectively reasonable in light of the facts,' a standard which we will refer to as one of 'reasonable belief.'" Peters v. Jenney, 327 F.3d 307 (4th Cir. 2003)(citing Weeks v. Harden Mfg. Corp., 291 F.3d 1307, 1312 (11th Cir.2002)). Although it is not necessary that she show a meritorious Title VII claim, she must at least show a reasonable belief that the employment practice did violate Title VII.

Plaintiff fails to specifically identify how she objectively or subjectively believed defendant was engaging in an unlawful employment practice. Clearly, she has failed to submit evidence of an objectively reasonable belief that defendant was engaging in unlawful employment actions. Additionally, she has failed to show the necessary causal connection. Assuming she has presented a *prima facie* case, she has failed to show pretext as discussed above.

**Americans With Disability Act**

To prove a violation of the ADA, a plaintiff must establish that (1) she has a disability; (2) that she is a qualified individual; and (3) that the employer discriminated against her because of her disability.  Martinson v. Kinney Shoe Corp., 104 F.3d 683,686 (4th Cir. 1997).

Disability

The ADA defines "disability" as a (A) a physical or mental impairment that substantially limits one or more of the major life activities of an individual, (B) being regarded as having such an impairment, or (C) having a record of such an impairment.  42 U.S.C. §12102(2); Haulbrook v. Michelin North America, Inc., 252 F.3d 696, 702-03 (4th Cir. 2001).  The date upon which we must consider any "disability" is the date of the adverse employment action.  EEOC v. Stowe-Pharr Mills, Inc., 216 F.3d 373, 379 (4th Cir. 2000).

Substantially Limits

"Substantially limit" requires than an impairment significantly restrict the ability to perform a major life activity.  Halperin, 128 F.3d at 199.  We may consider the nature and severity of the impairment, its duration or expected duration, and any permanent or long term impact.  Id. (internal citations omitted).  The EEOC regulations define "physical impairment" as "any physical disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurologic, musculoskeletal, special sense organs, respiratory, cardiovascular, reproductive, digestive, genito-urinary, hemic or lymphatic, skin, and endocrine."  28 C.F.R. §1630.2(h)(1).[17]

An impairment rating in and of itself is not sufficient to establish an impairment that

_____

[17]  EEOC regulations can be used as a guidance in interpreting the ADA.  See Sutton, 527 U.S. 479-80.

substantially limits a major life activity. See Hill v. Baltimore City Dept. of Soc. Servs., 141 F.3d 1158 (4th Cir. 1998); Bolton v. Scrivner, Inc., 36 F.3d 939(10th Cir. 1994); Thomas v. Northern Telecom, Inc., 157 F.Supp.2d 627,632 (M.D.N.C. 2000); Bailey v. Mecklenburg Board of Educ. , 2001 WL 101976 (W.D.N.C. 2001).  It is plaintiff's burden to set forth sufficient evidence to show her impairment substantially limits a major life activity.  Halperin, 128 F.3d at 199.  It is not necessarily the name or diagnosis that determines whether or not a person has a disability, but rather the "effect of that impairment on the life of the individual."  Sutton, 527 U.S. at 483 (citing 29 C.F.R. pt. 1630, App. §1630.2(j)).  It is the actual limitations a person endures that must be substantially limiting.

The EEOC regulations define "major life activities" as "functions as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. §1630.2(I).  A person is substantially limited in the major activity of working if he is barred from generally obtaining employment of a given type, as opposed to being barred from a specific job. Gupton v. Virginia, 14 F.3d 203,205 (4th Cir. 1994). A temporary physical impairment is not sufficient to grasp the protections of the ADA.  See Pollard v. High's of Baltimore, Inc., 281 F.3d 462 (4th Cir. 2002); Halperin, 128 F.3d at 199("[T]he term 'disability' does not include temporary medical conditions, even if those conditions require extended leaves of absence from work.")(internal citations omitted).

Plaintiff fails to submit proof of a condition which substantially limits a major life activity. See Poindexter v. Atchinson, Topeka, and Sante Fe Ry. Co., 168 F.3d 1228 (10th Cir. 1999)(A plaintiff must articulate with precision the impairment alleged and the major life activity affected by the impairment).  Plaintiff fails to properly submit evidence sufficient to show a medical

-37-

condition which substantially limits a major life activity. The record discloses that defendant was informed of an anxiety disorder, chronic fatigue, a back strain, and other conditions. The record does not contain proof of these conditions, whether or not they were temporary, to what extent they may limit a major life activity, or other specifics. The record also discloses that plaintiff missed a substantial amount of work and that defendant questioned and wanted substantiation for her condition(s). Plaintiff fails to present sufficient evidence of a disability to withstand defendants' motions for summary judgment.[18]

Qualified Individual

A "qualified" individual is defined as "an individual with a disability who, with or without reasonable accommodations, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. §12111(8). The evidence clearly establishes that plaintiff was not able to perform the essential functions of her job. Halperin v. Abacus Technology Corp., 128 F.3d 191, 197-98 (4th . Cir. 1997)(person is not "otherwise qualified" if she is unable to come to work on a regular basis).

The ADA does not require an employer to create a job as an accommodation, Barnett v. U.S. Air, Inc., 157 F.3d 744, 751 (4th . 1998). In some circumstances a temporary leave of absence may be a reasonable accommodation. See Haschmann v. Time Warner Entertainment Co., L.P., 151 F. 3d 591 (7th Cir. 1998); Criado v. IBM Corp., 145 F.3d 437 (1st Cir. 1998); Hudson v. MCI Telecommunications Corp., 87 F.3d 1167 (10th Cir. 1996). However, reasonable accommodation does not require an employer to wait indefinitely for medical conditions to subside or be corrected. Myers v. Hose, 50 F.3d 278 (4th Cir. 1995). Plaintiff must show that he can perform the essential

---

[18] Plaintiff does not argue that she meets either of the other two definitions of disability.

functions of the position in the immediate future.  Id.at 283.  See also United States Airways, Inc. v. Barnett, 535 U.S. __, 122 S.Ct. 1516, 152 L.E.2d 589 (2002)(must be reasonable "in the run of cases").  Accommodation involving deviation from company policy is generally not "reasonable." See Id.

The record establishes that defendants provided accommodations to plaintiff.  It also establishes that plaintiff was unable to come to work on a regular basis with the accommodations. Plaintiff was allowed a substantial amount of leave over an extended period of time and there was no indication that the duration of plaintiff's condition was finite.  The only other employee who was granted an extended leave accommodation was Mr. Hatch, who had chronic, terminal cancer (who's employment was terminated after exhausting his leave without pay).  There is insufficient evidence in the record to establish plaintiff as a qualified individual to defeat defendants' motion for summary judgment.

## Qualified Immunity

Assessing the application of qualified immunity involves a three pronged analysis.  First a court must determine whether, "[t]aken in the light most favorable to the party asserting injury, . . . the facts alleged show [that] the officer's conduct violated a constitutional right." Clem v. Corbeau, 284 F.3d 543,549 (4th Cir. 2002)(citing Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151, 2156 150 L.Ed.2d 272 (2001).  "If the answer is 'no' then the analysis ends; the plaintiff cannot prevail.  If the answer is 'yes,' then 'the next, sequential step is to ask whether the right was clearly established' at the time of the events at issue." Id.  This inquiry should be made considering the specific facts of the case at issue.  Id.  "[I]f it was not 'clear to a reasonable officer' that the conduct in which he allegedly engaged 'was unlawful in the situation he confronted' – then the law affords immunity

-39-

from suit.  Id.  In other words, qualified immunity protects an officer if the law was not clearly established or if, although clearly established, a reasonable officer under the circumstances could have failed to appreciate that his conduct would violate the clearly established law.  Pritchett v. Alford, 973 F.2d 307, 312 (4th Cir. 1992).  Qualified immunity protects all but the "plainly incompetent" or those who "knowingly violate the law."  Malley v. Briggs, 475 U.S. 335, 341 (1986); Doe V. Broderick, 225 F.3d 440, 446 (4th Cir. 2000).  Public officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.  Maciariello v. Sumner, 973 F. 2d 295 (4th Cir. 1992).

In a discussion of qualified immunity, the Court of Appeals for the Fourth Circuit  stated:

> In determining whether the specific right allegedly violated was 'clearly established,' the proper focus is not upon the right at its most general of abstract level, but at the level of its application to the specific conduct being challenged. Moreover, the manner in which this [clearly established] right applies to the actions of the official must also be apparent.  As such, if there is a "legitimate question" as to whether an official's conduct constitutes a constitutional violation, the official is entitled to qualified immunity.

Wiley v. Doory, 14 F. 3d 993 (4th Cir. 1994) (internal citations omitted), cert. denied, 516 U.S. 824 (1985).

Defendants claim that because of the holding in Jett that a §1981 claim cannot be maintained against a state actor, the asserted statutory claim is at least questionable.  In other words, defendants claim that because Jett holds that plaintiff may only bring a §1981 claim pursuant to §1983 the statutory right is at best questionable.  Defendants argument is without merit.

Defendants also argue that the law is not settled regarding whether or not a claim against an individual defendant not a party to the contract giving rise to the §1981 claim can be maintained. They cite the Fifth Circuit case of Felton v. Polles, 315 F.3d 470,480(5th Cir. 2002) in support of

-40-

their argument.  Plaintiff's alleged contract of employment was with the State of South Carolina (or South Carolina Department of Mental Health) and not with the individual defendants.  The undersigned has been unable to find precedent from the Fourth Circuit or the Supreme Court on this issue.  The Fifth Circuit in <u>Felton</u> and more recently in <u>Foley v. Univ. of Houston System</u>, 355 F.3d 333, 337 (5th Cir. 2003) noted that the issue has not been decided.  <u>See also</u> <u>Oden v. Oktibbeha County, Miss</u>, 246 F.3d 458 (5th Cir.), *cert. denied*, 534 U.S. 948, and *cert. denied*, 534 U.S. 949 (2001).  Accordingly, whether or not the individual defendants may violate §1981 when they are not a party to the alleged contract between plaintiff and the State of South Carolina (or SCDMH) is not clearly established.  Therefore, the individual defendants are entitled to qualified immunity from plaintiff's §1981 claims brought pursuant to §1983.

Additionally, as set forth above, plaintiff has failed to show a violation of a constitutional or statutory right.  Therefore, as directed by the case law, the inquiry ends.

For the foregoing reasons, it is recommended that defendants' motions for summary judgment (Documents #74 & #77) be granted.


August 15, 2005                              s/Thomas E. Rogers, III
Florence, South Carolina                     Thomas E. Rogers, III
                                             United States Magistrate Judge




**The parties' attention is directed to the important notice contained on the following page(s).**

-41-

<u>**Notice of Right to File Objections to Magistrate Judge's "Report and Recommendation"**</u>

**&**

**The Serious Consequences of a Failure to Do So**

The parties are hereby notified that any objections to the attached Report and Recommendation (or Order and Recommendation) must be filed within ten (10) days of the date of service. 28 U.S.C. § 636 and Fed. R. Civ. P. 72(b). The time calculation of this ten-day period excludes weekends and holidays and provides for an additional three days for filing by mail. Fed. R. Civ. P. 6. A magistrate judge makes only a recommendation, and the authority to make a final determination in this case rests with the United States District Judge. *See* <u>Mathews v. Weber</u>, 423 U.S. 261, 270-271 (1976); and <u>Estrada v. Witkowski</u>, 816 F. Supp. 408, 410, 1993 U.S.Dist. LEXIS® 3411 (D.S.C. 1993).

During the ten-day period for filing objections, <u>but</u> <u>not</u> <u>thereafter</u>, a party must file with the Clerk of Court specific, written objections to the Report and Recommendation, if he or she wishes the United States District Judge to consider any objections. Any written objections must *specifically identify* the portions of the Report and Recommendation to which objections are made *and* the basis for such objections. *See* <u>Keeler v. Pea</u>, 782 F. Supp. 42, 43-44, 1992 U.S.Dist. LEXIS® 8250 (D.S.C. 1992); and <u>Oliverson v. West Valley City</u>, 875 F. Supp. 1465, 1467, 1995 U.S.Dist. LEXIS® 776 (D.Utah 1995). Failure to file written objections shall constitute a waiver of a party's right to further judicial review, including appellate review, if the recommendation is accepted by the United States District Judge. *See* <u>United States v. Schronce</u>, 727 F.2d 91, 94 & n. 4 (4th Cir.), *cert. denied,* <u>Schronce v. United States</u>, 467 U.S. 1208 (1984); and <u>Wright v. Collins</u>, 766 F.2d 841, 845-847 & nn. 1-3 (4th Cir. 1985). Moreover, if a party files specific objections to a portion of a magistrate judge's Report and Recommendation, but does not file specific objections to other portions of the Report and Recommendation, that party waives appellate review of the portions of the magistrate judge's Report and Recommendation to which he or she did not object. In other words, a party's failure to object to one issue in a magistrate judge's Report and Recommendation precludes that party from subsequently raising that issue on appeal, even if objections are filed on other issues. <u>Howard v. Secretary of HHS</u>, 932 F.2d 505, 508-509, 1991 U.S.App. LEXIS® 8487 (6th Cir. 1991). *See also* <u>Praylow v. Martin</u>, 761 F.2d 179, 180 n. 1 (4th Cir.)(party precluded from raising on appeal factual issue to which it did not object in the district court), *cert. denied,* 474 U.S. 1009 (1985). In <u>Howard</u>, <u>supra</u>, the Court stated that general, non-specific objections are *not* sufficient:

> A general objection to the entirety of the [magistrate judge's] report has the same effects as would a failure to object. The district court's attention is not focused on any specific issues for review, thereby making the initial reference to the [magistrate judge] useless. * * * This duplication of time and effort wastes judicial resources rather than saving them, and runs contrary to the purposes of the Magistrates Act. * * * We would hardly countenance an appellant's brief simply objecting to the district court's determination without explaining the source of the error.

*Accord* <u>Lockert v. Faulkner</u>, 843 F.2d 1015, 1017-1019 (7th Cir. 1988), where the Court held that the appellant, who proceeded *pro se* in the district court, was barred from raising issues on appeal that he did not specifically raise in his objections to the district court:

> Just as a complaint stating only 'I complain' states no claim, an objection stating only 'I object' preserves no issue for review. * * * A district judge should not have to guess what arguments an objecting party depends on when reviewing a [magistrate judge's] report.

*See also* <u>Branch v. Martin</u>, 886 F.2d 1043, 1046, 1989 U.S.App. LEXIS® 15,084 (8th Cir. 1989)("no de novo review if objections are untimely or general"), which involved a *pro se* litigant; and <u>Goney v. Clark</u>, 749 F.2d 5, 7 n. 1 (3rd Cir. 1984)("plaintiff's objections lacked the specificity to trigger *de novo* review"). This notice, hereby, apprises the plaintiff of the consequences of a failure to file specific, written objections. *See* <u>Wright v. Collins</u>, <u>supra</u>; and <u>Small v. Secretary of HHS</u>, 892 F.2d 15, 16, 1989 U.S.App. LEXIS® 19,302 (2nd Cir. 1989). Filing by mail pursuant to Fed. R. Civ. P. 5 may be accomplished by mailing objections addressed as follows:

Larry W. Propes, Clerk
United States District Court
Post Office Box 2317
Florence, South Carolina 29503
